# BALTIMORE & POTOMAC RAILROAD COMPANY

*v.*

# LANDRIGAN.

---

RAILROADS; NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE; PRESUMPTIONS.

1. Where an employee of a railroad company whose habit it was to go to his home from the round-house between 12 o'clock midnight and 1 o'clock over the company's tracks at a street crossing, was found mortally injured at the crossing, and in an action

against the company by his administratrix the plaintiff's testimony left it doubtful as to whether the deceased was run over by a Pullman car that had broken loose and run down past the crossing on one of the two tracks at that point, or by an express train which had passed on the other track about the same time, but many circumstances indicated that he was struck by the Pullman car, it was *held* that a declaration made by the dying man when picked up that a whole string of cars ran over him did not necessarily refute the circumstances tending to show that the Pullman car had struck him, and that it was a question for the jury as to whether it was negligence in the defendant's employees to permit that car to escape and run down the track past the street crossing.

2. It is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence or contributory negligence is considered as one of law for the court; *following* Adams v. Railroad Co., 9 App. D. C. 26, and Cowen v. Merriman, 17 App. D. C. 186.

3. What is proper care and caution cannot be arbitrarily defined but must depend upon the special circumstances of each case; and what may be ordinary care under one set of circumstances might be gross negligence under different conditions.

4. Where in an action to recover damages for the negligent killing of the plaintiff's decedent, who was picked up near the tracks at a railroad crossing mortally injured, no witnesses saw the deceased immediately before he passed under the arm of the gate at such crossing or between that time and when he was injured, and his only declaration when he was picked up was that he had been run over by a whole string of cars, the jury have the right to presume that he had both looked and listened for approaching cars before attempting to cross the tracks; and an instruction so charging the jury, and adding that this presumption might be rebutted by facts and circumstances from which the contrary could be reasonably inferred is a proper one; *following* Cowen v. Merriman, 17 App. D. C. 186.

5. Certain facts and circumstances relied upon by the defendant, in such an action, to show that the deceased did not stop, look and listen at such crossing reviewed, and *held* to raise a question for the jury.

6. Where a gate at a railroad crossing had not been uniformly lowered and raised on the passing of trains but was often lowered from 10 to 11 o'clock at night and kept so lowered until daylight the next morning, without regard to the passing of trains, and persons desiring to cross in vehicles were frequently compelled to call up the gateman to raise the gate, while those on foot would

do the same or else pass under the gate and then cross the tracks, it cannot be held to have been contributory negligence in law for one accustomed to use such crossing to pass under the gate after midnight and to attempt to cross the tracks, especially when there is nothing to show that there was a gateman who might have been called to raise the gate.

No. 1168. Submitted April 15, 1902. Decided May 13, 1902.

HEARING on an appeal by the defendants from a judgment of the Supreme Court of the District of Columbia entered upon the verdict of the jury in an action by an administratrix to recover damages for the alleged negligent killing of her decedent. *Affirmed.*

The COURT in the opinion stated the case as follows:

This is an appeal from a judgment for the sum of $6,500 recovered of the appellants, the Baltimore and Potomac Railroad Company and the Philadelphia, Wilmington and Baltimore Railroad Company, by the appellee, Catharine Landrigan, in an action of damages for the negligent killing of her husband, of whose estate she is the administratrix.

As the case turns upon the sufficiency of the evidence to warrant its submission to the jury, a full statement of the same is made necessary.

About midnight on August 29, 1898, the intestate, Thomas J. Landrigan, was found near one of the tracks of the Baltimore and Potomac Railroad Company in the city of Washington at the intersection of South Capitol street. He had been run over by a car or cars on one of said tracks and so badly injured that he died about four o'clock in the morning.

He was thirty-two years old, and had a wife but no children. He had been in the employ of the railroad company for about eight years in its round-house in Washington, as a machinist. He was an assistant boss of the night force with an average wage of $65 per month. His hours of work were from 7 P. M. until 6 A. M., with an hour for lunch between 12 and 1 o'clock. His habit had been to go home for lunch, sometimes starting a little before 12 o'clock and sometimes a

little later. His nearest route led across the tracks at South Capitol street. There was testimony tending to show that the night of the accident was a dark and cloudy one. Intestate furnished from $53 to $58 per month to his wife for her support and for household expenses. His wife was twenty-six years old. The American mortality tables were introduced to show the probable duration of life of husband and wife, based on their respective ages at the time of his death.

Other evidence introduced on the part of the plaintiff as tending to show that the death of Thomas J. Landrigan was caused by the negligence of the defendants is recited in the bill of exceptions as follows:

"Charles J. Motley testified that he resided at No. 318 Third street, southeast, Washington, D. C., and had been in the employ of the Philadelphia, Wilmington and Baltimore Railroad Company for nine years; in August, 1898, he was employed by said railroad company as flagman and extra conductor engaged in the shifting operations around the 'Jersey yards' of said company; on the night Landrigan was killed he (witness) was acting as conductor and was engaged in making up trains; the 'Jersey yards' extended from South Capitol street east to New Jersey avenue; the engine yard or round-house yard is also a part of what is called the 'Jersey yard;' the round-house is on South Capitol street, south of the South Capitol street crossing; at this crossing there are four tracks, the farthest to the north, next to the Government reservation, being used for shifting purposes, the two tracks immediately south of it being the north and south bound main tracks, and the most southerly track being what is called the 'lead' or 'ladder' track; this 'ladder' track was used for shifting purposes, for shifting out cars; all the tracks in the 'Jersey yard' lead into the 'ladder' track; said 'ladder' track, from one end of it to the other, runs all the way from F street southwest to I street southeast and crosses South Capitol street; on the night of the accident to Landrigan witness was the yard conductor engaged in making up a train of tourist or passenger cars to go south; he had pulled eight or nine cars out on the 'ladder' track, and while these cars were

standing upon the 'ladder' track the last car broke away,
ran down the 'ladder' track, which is an ordinary down-
grade from the point where the car broke away, towards
South Capitol street; at the time the coach broke away it was
coming out on the 'ladder' track, and the break occurred at
a point leading into a switch at a little curve; this coach had
been taken from one of the storage tracks and had been
brought out on the 'ladder' track; witness coupled the coach
himself with the assistance of brakeman Wilhoit and Mr.
Hottal, the yardmaster, who was there to give him the signal;
the car that broke away was a Pullman, and the car to which
it had been coupled was a tourist car; the Pullman had a
Janney coupler, and there was a Miller coupler on the tourist
car; the Miller and Janney couplers would not couple — they
were not made or intended to couple together; one was a little
higher than the other, the Janney being the higher of the two,
but do not remember whether or not one went over the other;
one of the drawheads also was higher than the other; it was a
very difficult coupling to make, and a link and pins had to be
used to couple the cars together; this difficulty arose from the
fact that they were not the same sort of couplers; that he
did not know whether the difference in height made them less
or more difficult to couple; he coupled the two cars in ques-
tion by putting a link in the Janney coupler and putting a
pin through the hole in that coupler, then laid the link on top
of the Miller coupler and put a pin down through it; in both
the Janney and Miller couplers there is a slot for a link and
also a hole for the pin to go in; he did not put the link in
the slot of the Miller, because he could not get it in there;
that he could not explain why he did not do it that way; it
was a difficult coupling to make either way; he did not
remember whether they tried to do it that way or not; he
coupled it the best way he could — the easiest way he could
couple it; he did not remember whether the difference in the
height of the two couplers had anything to do with causing
him to put the link on top of the Miller coupler instead of
placing it in the slot of the Miller; he did not remember
whether it was on a curve or on a straight track when he

coupled the cars together; the pin held the link in position on top of the Miller coupler; the link could not very well go over the top of the pin which held it in place; leading over the switch, the two couplers rubbing together forced the pin up out of the hole, so as to pry it up. If he were coupling two cars together the drawheads of which came together plumb and even, one being as high as the other, and each containing a slot for a link and a hole for the insertion of the pin, in coupling them with a link and pin, he would put the link in the slot and not on top of the coupler; on this occasion he laid the link on top of the Miller instead of putting it in the slot, because that was the easiest and best way and the only way he could couple it; the link was too short to put it in the slot of the Miller coupler, but the link was long enough to enable the pin to go down through the hole; where the link is laid on top of the coupler instead of in the slot he does not know what would be the effect upon the rear coach if a slack should take place by the cars coming together; that the coupling which he made was a very ordinary coupling and is made right along; possibly it might hold all right; he had never seen it break loose before; it was customary to couple cars by putting the link on top instead of through the slot; this coupling was caused to break away by the slack running up between the cars when they jolted together — by the Janney and Miller couplers running up together; the rubbing together made the pin raise up and broke it loose; when coaches are properly coupled together they break loose very often in that way; when two cars are properly coupled with the link and a slack is produced causing them to bump together, they come apart sometimes, although this is very rare and it is also very rare that the other coupling comes apart; when the car broke away he yelled to the rest of the crew who were on the rear end of the car; he was standing on the steps of the tourist car on the end next to the Pullman, which broke away; this Pullman car was called the ' Lylete;' he does not remember what became of the link or pin after the car broke away; he looked at the ' Lylete ' and saw the link, but did

not look at it particularly; he did not remember the words
he used when he called to the crew; the men on the car,
Hottal and Wilhoit, did all they could to stop it; he saw
these men putting the brake on at the end of the Pullman
car next to him, but could not see what they did at the other
end; he did not know whether they left the end next to him
for the purpose of putting the brakes on the other end; the
car ran a little over a hundred yards probably before it
stopped; it was stopped by striking some cars down on the
'ladder' track; these cars were loaded with sand and coal,
as well as he remembered; the end of this 'ladder' track in
the neighborhood of South Capitol street was used for shift-
ing purposes and for putting cars or anything there they
wanted to store there; he has never seen passenger coaches
stored down there because it is not long enough for that; the
only cars he ever saw stored there were freight cars.    Said
witness further testified that he saw Landrigan that night,
and when he first saw him he was lying on the ground near
to and south of the 'ladder' track at South Capitol street;
Landrigan was at the side of the 'ladder' track, at the inter-
section of South Capitol street; Mr. Fenton was fixing up
his wounds; Landrigan was afterwards carried away in an
ambulance and died in a hospital the next morning; at the
time witness saw him he looked like he was pretty badly
mashed up — looked like he had been run over; that it was
about 11:55 P. M. when he saw him; Landrigan lived at 31
or 33 Virginia avenue, on the north side of the railroad
tracks; he was a machinist and employed on the night force
in the round-house; he had known Landrigan about three
years, during all of which time Landrigan had been in the
employ of the railroad company.    There was a white light
in the vestibule of the Pullman car that broke away — in
the little dome-shaped arrangement in the roof of the car;
this was the only light hanging in the vestibule, and there
was no light on the platform; the link and pin used in mak-
ing the coupling were the ordinary link and pin; that two
Janney or two Miller couplers will couple together without
requiring the use of a link and pin, but a Janney and Miller

coupler will not couple of themselves and you have to use a link and pin to couple them; that the Miller and Janney couplers were not intended to couple together."

And thereupon said witness, on cross-examination, further testified that at the southwest crossing of South Capitol street there were four railroad tracks, the first track from the south being the ladder track, the track immediately to the north of it being the north-bound main track, the next track to the north the south-bound main track, and the fourth track or the one on the north side of the crossing being called the reservation track — a freight track; that the ladder track extended west of the crossing to an alley (the witness indicating a point on the map about a square and a half distant), and east of the crossing it extended to K street southeast; the round-house was a little to the south and east of the crossing and there were tracks connecting it with the ladder track; east of the crossing of South Capitol street were the " Jersey yards " of the company, and all of the tracks in that yard connected with the ladder track; that this is why it is called the " lead or ladder track;" the gateman's box at the southwest crossing is at the northeast corner of the crossing, and at the southeast crossing of South Capitol street it is at the southeast corner; on the west side of South Capitol street there is a pavement leading up to the southwest crossing; there were safety gates on both sides of the railroad track at this crossing, and between the end of the gate on the south side and the tool-house west of the southwest crossing, which is marked on the map, there was a fence, five feet high, which extended up to the gate; that between the ladder track and this fence there is an open or vacant space; between the south rail of the ladder track and this fence or the crossing gates there is a space of about 10 feet; a person could not walk around the end of the gate and get on the track. Said witness further testified that the ladder track on that night had been in use in their shifting operations from about 7 or 7:30 o'clock; that in these shifting operations they would go all the way down to the crossing at South Capitol

street if necessary, but witness did not remember going: all the way down there that night; on other nights they had been in the habit of going all the way and crossing. South Capitol street when engaged in shifting operations; the ladder track was a track that was used more or less. frequently in shifting operations from one end of it to the other; cars were put on the ladder track west of South Capitol street to be unloaded or just to get rid of them for a short while, sometimes; they would put them there so as to have them where they could get hold of the cars handy; they would be put there temporarily during shifting operations. It was not customary to handle passenger cars on that side of the southwest crossing of South Capitol street; witness and his men were freightmen ordinarily,. but are called upon now and then to handle passenger cars; on the night of the accident they were handling passenger· cars and were making up a train of tourist cars in which to load soldiers to go south; in the shifting operations in the yard in August, 1898, different kinds of cars would be received there — foreign cars belonging to different roads — especially at that time when soldiers were traveling there was a great deal of traffic and they were moving a great many troops; on these cars they would find a great many· Miller and Janney couplers; it was more usual to find Miller· couplers on foreign cars in August, 1898, than it is to-day; they are seldom seen now; it was an ordinary occurrence at that time in the yard to couple cars up with Miller and Janney couplers on them; the Miller and Janney couplers are entirely different and will not couple of themselves; they must be coupled by putting a pin in the Janney and another in the Miller and connecting the two with a link; this is the ordinary way of coupling two such cars, and the only way that the witness knew to couple them. Witness followed the runaway car down to the crossing after· he got rid of the rest of the cars; he reached there about three minutes after the car passed over the crossing; that he forgets whether he noticed the condition of the gates. at that time; the crossing was lighted by the street lamps·

located on each of the four corners, and there was an electric light in the reservation north of the tracks (indicating a point on the map northeast of the intersection of South Capitol street and the railroad tracks) and another one south and east of the tracks near the signal tower; the lamp in the dome of the vestibule of the Pullman car had a white shade or globe underneath; it gave a bright light — you could see it all right; the lamp was inside of the door and the door was closed; the glass in the door extended about half way down and the light shone through the glass in the door; you could see the light very plainly as you looked at it; the same sort of a light was in both ends of this car. Said witness further testified that if they had not made a link and pin coupling they might have pulled the cars out with a big, heavy chain; a chain is used sometimes when the drawhead is pulled all the way out; where there are two drawheads with a coupler in each drawhead, the ordinary way to couple them is to use a link and pin whenever the couplers are not alike.

And thereupon, on redirect examination, said witness further testified that he supposed, to guess at it, that the car ran probably a hundred yards from the place where it broke away until it hit Landrigan, and then about twenty-five yards after it hit him before it stopped. Said witness further testified that there were two crossings at South Capitol street, the southwest and southeast crossings; the street was divided by parking which ran in the center of it; these two streets or crossings were about 50 feet apart; Landrigan was killed at the southwest crossing; the railroad tracks where they intersect with South Capitol street are on Virginia avenue. The nearest electric light to the point where Landrigan was killed was on the east side of the southeast crossing and north of the tracks; this light was about 75 yards from where Landrigan was struck. There were nine coaches attached to the engine when the car broke away. The car that broke away was the last coach; Hottal, the yardmaster, was present when witness coupled the cars together; that witness told him that he could couple

them up the way they were coupled, and Hottal said, "Couple them up some way, and get them out of here;" at that time the crew was waiting for the car on the main track, and they were in a hurry to get it out; he was having some difficulty to get it coupled when he made this remark at Hottal; it is not true that the cars would not couple at all — they would not couple without using a link and pin; the coupling was safe enough to pull the car out of the yard, and that was all that was wanted; it did not do it on that night because it broke loose; nothing extraordinary happened to make it break loose; the Janney coupler was about $2\frac{1}{2}$ inches higher than the Miller, but he did not think that the Janney slid all the way over the Miller when they came together; he did not remember testifying at the former trial of the case that "the Janney went clean over' the top of the Miller;" the Janney coupler, the lip of it, would not be over $2\frac{1}{2}$ inches thick, which would pretty nearly take it over; it was about $2\frac{1}{2}$ inches higher than the other, but he does not remember whether it went over it or not; whatever he testified to at the former trial was true; the couplings "slipped around," he supposed, when they were going around the curve, and that had a tendency to make them come apart; that he supposed it was due to the slack caused by coming over the switch on the ladder track; that the statement made by him at the former trial that he "used a link, put a pin down through the Miller, just a temporary coupling, to pull the car up this track, and put the link over the Miller, put the link down in the Miller, and stuck a pin through the link, and the pin having a head on it held in that position, held the link in position to pull the car out; but when it got up on the curve the slack ran together, and probably the pin dropped down; the link jumped over, or twisted off the head of the pin — that is as nearly as I can explain it to you about this coupling" — was substantially correct.    Said witness further testified that after the car was coupled they pulled it probably 45 or 50 yards, and when it got on the curve formed by the ladder track and the track from which they were

bringing it, it broke away; that he knew this curve was there; that he did not remember testifying at the former trial that they could not stop the car because of a " defect in the brake, the brake did not hold," but that it is true that the brake might have hung in some way; the brake did not hold the car, but he does not know what was the matter with it; that he was taking the train of cars in the opposite direction from the point where Landrigan was killed, and intended to give this car to the crew that was waiting for it on the main track; the reason, as well as he remembers it, why he put the link on top of the Miller coupler was because the Janney was higher than the Miller; they could have used a chain on that night, but did not have any to use when they wanted to get the car out; there were chains in the yard; he does not know whether the chain would have been perfectly safe or not; the car might have broken away by the chain becoming untied, or loose, or breaking, unless it was very strong; that he did not remember examining the pin on the tourist car, but remembered looking at the pin in the Lylete, the Pullman car; this pin was still in the hole in the link, and this satisfied him that the link had pulled over the head of the other pin.

And thereupon said witness, on recross-examination, further testified that the head of the pin would not go through the hole in the link and would hold it in position; that the drawhead was a big piece of iron fastened to the end of the car, and the coupler was attached to the end of the drawhead; when the drawhead is completely pulled out the coupler comes with it; when two cars are in that condition they have to use a chain to keep them together; when the cars have a complete drawhead and coupling attached, no chain is necessary, and they simply used a link and pin coupling when the couplers are not alike; this was the way they did on that night; there was nothing the matter with the drawheads; they were simply different couplers and would not couple; they were getting these cars out to put them on the train that Fenton's engine was attached to; this train, as well as he remembered, was standing on the

south-bound main track, facing towards the depot; when he reached the crossing after the accident he found the engine standing there on either the main track or No. 1 track, right close to the point where Landrigan was found and about 25 yards distant; it was about northwest of the crossing, on the north side of the track, and about ten yards from the crossing; that he did not remember exactly the position of the engine — he saw it over there, but did not take particular notice whether it was on the crossing or not.

And thereupon, on redirect examination, said witness further testified that Fenton's engine and train were standing nearer the southwest crossing than the southeast crossing; the engine was headed south or towards the depot, and, as well as he remembered, about 10 feet from the southwest crossing; that he did not remember whether or not it had any box cars attached to it.

And thereupon the plaintiff, further to maintain the issues upon her part joined, read in evidence the testimony of Kenneth D. Willhoit, deceased, who testified for the plaintiff at a former trial of the cause. Said witness testified that he had been in the employ of the Philadelphia, Wilmington and Baltimore Railroad Company as brakeman for five years; on the night Landrigan was killed he was acting as flagman in the yard in connection with the yard engine; he did not know Landrigan personally; had seen him a number of times; he saw him after he was hurt; Landrigan's legs were run over, but he could not say whether it was by a car or another train; train No. 78, which left the depot about 11:55 or 11:35, was passing there about the time of the accident; this train No. 78 is known as the midnight express for New York and crossed South Capitol street, where Landrigan was hurt, going in an easterly direction; when witness saw Landrigan the latter was lying on the south side of the outside rail of the " ladder track," the most southerly track of the four tracks at that crossing; there is a tool-house to the west of that crossing, and a fence running along south of the tracks and in front of the tool-

house; Landrigan was between this fence and the outside rail of the "ladder" track; immediately before he saw Landrigan lying there the coach "Lylete" passed over the crossing at South Capitol street and witness came right along behind this car, after train 78 passed, to see if the coach had done any damage down there and saw Landrigan lying there with some one around him; he went down where the car had stopped and came back and found out what the trouble was; that Motley was the conductor of the yard engine and Anderson the engineer; he thinks there were five or six coaches attached to the yard engine; that an ordinary passenger coach is 60 or 70 feet long; Hottal, the yard master, Motley, and himself made the coupling; one car had a Miller, and the other — the one that broke away — had a Janney coupler; it is impossible to couple a Miller and Janney together; it was on a curve, and therefore they used a link and pin; it was a secure coupling to pull the car around in the yard, but it was not a safe coupling to run over the road; it was sufficient for the yard and was very frequently done; the couplings did not couple exactly because they did not fit; you cannot couple two such couplings together and have to use a link and pin; the Miller coupler is not as high as the Janney; it is a thinner piece of iron and the drawhead is thinner than that of the Janney; the link was put in the Janney all secure and then laid over the top of the Miller and a pin run through the top of the link and down through the hole in the Miller; there was a place in the Miller coupler for the link to go in, but it was a little lower and it could not be put in there on account of that curve; they coupled the cars right on a curve; the curve swayed the car around and brought the Miller coupler out on the side, like; when the pin was put down through the link and into the hole in the Miller coupler the head of the pin was on top of the link, and the only thing to keep the link from slipping over the head of the pin was the shoulder around the head of the pin; that he supposes it would have been safer if they could have put the link through the regular place for that purpose in the

Miller coupler; when they were pulling the car out on the straight track he tried the brake and it appeared to be all right, but when some one hollered that this car had broken off he went to work on it again; it did not seem to catch hold; he dropped off the end of the car and caught the rear end of it — the head end — and at the same time Hottal got on the end that he got off of; the witness called for Wilber to help him to put the brake on and they did all they could to stop the car, but the car had got too much start; the brake seemed to work all right — he did not have any fault to find with the brake, only the car had gotten too much start; he first tried the rear brake and could not get that to work; then went to the other one; while witness and Wilber were working the forward brake Hottal jumped on and tried to work the rear brake; they did not succeed in stopping the car, because it had gotten too much of a start.   He got off at South Capitol street on the southeast side, stood there for a second or two, and then ran after the car to see what damage it had done.   There were some other cars down on the end of this track, that this car ran into, and it would not have been safe for the witness to have stayed on the car.   He found out that the car had broken loose by some one halloaing (there were five of them around there at the time), but cannot say who it was or from which direction the sound came; the car was running slowly when he started to put on the brake.   He jumped off, went to the other end, and when he got there the car was not running very fast.   Hottal got on the rear end just as he got off.   That he does not know whether or not he said at the coroner's inquest that " he did not think the brake was any good or else it would have stopped the car," nor could he say whether he testified at the inquest that the front brake was loose and was not doing any good. The brake did not do any good, because the car had too much start; Wilber jumped off with him; that you some-times apply a brake and it does not " take up " right at first; that he could not say whether he noticed any slacking up of the car as a result of putting on the brakes, because

he got off, and it was dark, night-time, and he could not see; that he could not say whether he noticed any slacking up before he got off the car, because the brake had not taken any hold, so far as he knew; both Wilber and himself put the brake on as hard as they could; there was a light on both ends of the coach; there was a light in the coach, but none on the back platform; when he jumped off he did not exactly keep up with the car, but followed it down because 78 was coming at that time and he was afraid the runaway car would knock some of the cars out on the main track, and he followed down to see whether there was any trouble; that he practically kept up with the car, but was a little distance behind it; the car ran across the southeast and southwest sides of South Capitol street, beyond the point where Landrigan was, and into some flat cars loaded with dirt.

Said witness, on cross-examination, further testified that the Jersey yards consisted of a network of tracks between South Capitol street and New Jersey avenue, south of the main railroad tracks; that what is called the " old Jersey yard " contained tracks from 1 to 11, and the " new Jersey yard" began with track 4 and ran up to number 9; that on the other side or east of the Jersey yards was what is called the " engine yard;" the old and new Jersey yards are used for the storage of all passenger cars, sleepers, baggage and box cars, freight cars of all descriptions, and also as a yard to unload coal and to load different freight. There is a fence running from the southeast side of South Capitol street, from the gatetender's box to the southwest side of South Capitol street, the side next to the tool-house; that at both the southeast and southwest crossings are crossing gates, which come right up to the fence; these gates are double gates, and if they are down it is impossible for anybody to cross the track at either of the crossings at South Capitol street without getting under them; at the southeast crossing they could walk around the end of the gate, but they could not at the southwest crossing; Landrigan was found on the southwest side of the southwest crossing and

on the south side of the tracks; this "ladder" track is a
straight track, running from one end of the yard to the
other; it is also called the "lead" track because all the
other tracks in the yard lead into it; if they wanted to get
a car out of the other tracks it would be pulled out on this
"ladder" track; on this night they were engaged in mak-
ing up an equipment of cars to carry soldiers south; there
were some flat cars, stock cars, coaches, and this sleeper for
the officers, he supposed; they were pulling five or six cars
out to get this sleeper — the "Lylete" — to put it on the
rear of the train, their intention being to shove the remain-
ing cars back into the track from which they got them; that
he saw the coupling made, but did not make it himself;
when they found cars with the old-fashioned drawhead, and
wanted to couple them to a car with a Janney coupler, they
used a link and pin which was the usual coupling when
they got cars of that kind; this was done very frequently,
but it is not done so much now as formerly because they
got more cars with the new equipment; that he did not say
the Miller coupler was lower than the Janney, but that it
was not as thick as the Janney, which made it apparently
lower than the Janney when the cars came together; that
they laid the link on top of the Miller because they could
not get it into the groove; the top of the pin was holding
it in place; the track on which the runaway car was ran
parallel with — right by the side of — the track on which
No. 78 was coming; he jumped off the "Lylete" on the
southeast side of South Capitol street; 78 passed first and
then he ran down the north-bound track behind the "Ly-
lete;" that he saw some one was hurt when he went down,
but did not stop because, by the light being in the car, he
thought perhaps there was a porter or somebody in there,
and ran down to see what damage had been done to the
car; when he saw nothing serious had happened, he came
right on back to see this object; it was not over three min-
utes — not over two minutes — when he got back. When
he got back he saw Mr. Fenton behind, attending to Mr.
Landrigan, with his torch. Fenton had started to bind up

Landrigan's legs; Fenton's engine was on the opposite side, on the fourth track, on the north side of the south-bound track. It was standing about on South Capitol street, on the southeast side; he does not remember whether it was all the way over the crossing or not; he thought it was. It was just across from where Landrigan was lying, and was partially on the crossing; the gates were down; he first noticed the gates when he came down there after he had jumped off the end of the car; the gates were down then on both sides of the street. He did not notice the gates before 78 passed, because he had not been down that far; he stood on the southeast side of South Capitol street until 78 passed, and then started to run down the main track, and as he ran down the track he noticed that the gates were down on both sides.

Said witness, on cross-examination, further testified that when he reached Landrigan the latter was conscious to a certain stage; he asked Fenton who it was, and Fenton said it was " Tom Landrigan." When he got back where Landrigan was, Hottal, the yardmaster, Mr. Fenton, and Mr. Bright were there, and either Mr. Hottal or Mr. Bright asked Landrigan, " How did this thing happen? " and Landrigan said, " I came under the gates and something struck me, and a whole string of cars ran over me;" that was all witness heard him say. He did not hear him say anything about train No. 78; nothing more was said that he can remember; he saw Landrigan put in the ambulance which came up pretty soon after the accident — about as soon as they could get there; the gates were raised when Landrigan was put in the ambulance. Said witness further testified that the lead or ladder track is used all the time, backwards and forwards, on week days especially, and very frequently on Sundays for putting cars in and pulling them out; that the light in the car was in the dome — in the vestibule — just on the outside of the door, over the platform; he knows there was a light in the west end of the car, the end going towards South Capitol street — which was the front end of the car the way it was moving; this light could

be seen more plainly than a lamp; such lights contain two burners, are lighted by oil, and are more brilliant than a lantern; the reflector is over the top of the light; there is a kind of white shade over them. Said witness further testified that between the gate and the first rail of the track south of which Landrigan was found there was a clear space of about 14 or 15 feet; the tool-house set off from the gate about 17 feet, and Landrigan was nearer the tool-house than the gate; he was nearer the track than the gate, but inside of the gate. Said witness further testified that the runaway car passed the southwest crossing of South Capitol street before No. 78 reached there; it struck just the middle part of No. 78 as the train came by there; the runaway car had just about gotten across the crossing when the engine of No. 78 began to cross the crossing; it was almost at the same time.

Thereupon, upon redirect examination, said witness further testified that the light in the vestibule of the car could be seen by people on the ground; it hung down low and did not set right up in the dome; it had a shade over it, but he does not know whether you could call it a reflector or not; it was plain enough to be seen by anybody who was on the ground; that he did not remember stating at the coroner's inquest that " he would expect a coupling like that to give away — that it was an unsafe coupling. Said witness further testified that there were some cars standing on the end of the ladder track; that this track is a blind track down there — it stops right at the end of the property yard; it ran alongside of the property-yard fence and stopped on the southeast side of the F street crossing."

Plaintiff introduced evidence tending to show that the south or ladder track, on or near which it was admitted on the trial by her counsel that her intestate went under the gate and must have stood, extended west about 200 feet from the crossing. One witness called it a " dead track," " because it does not lead anywhere, but just stops." That the part of this track as far as the South Capitol street crossing was used chiefly for storing cars with supplies of

·coal and other things for the use of the railroad company, and was not used for making up trains. That no passenger ·cars were brought that far down and the moving of freight cars thereon was for the purpose of taking in and taking out those put there from time to time, as aforesaid, some of which were generally standing there, as they were on the night of the accident. That the grade of the ladder track inclined to this western end, and gravity would carry down to it a car that might break loose above. That cars standing on this track would obstruct the view of trains coming from the depot on the inner or main tracks; the watchman's box and tower-house also obstructed ·the view to the east, and one would have to leave the gate and get on or near the ladder track to see cars coming for some distance. That ·curves in the tracks also tended to prevent the observation of moving cars.

The testimony of another witness for the plaintiff is given in full, as follows:

" Frank C. Kappel testified that he was a brother of the plaintiff, Mrs. Landrigan; that in August, 1898, he was employed at the Pennsylvania Railroad Company's round-house; that Landrigan was employed there as a machinist, and was on the night force; that between 12 and 1 o'clock they were allowed one hour for lunch, and Landrigan was in the habit of taking that hour off; Landrigan had been in the employ of the railroad company for about nine years in this same place and had been living on the north side of Virginia avenue ever since witness first knew him; the night Landrigan was killed was not a clear night nor was it a really dark night — there was no moon and there were a few ·clouds; that the most usual and direct route to Landrigan's house from the round-house was up South Capitol street to the southwest crossing, then right over to the north side of Virginia avenue; this was the way Landrigan usually took; the round-house was between H and I streets on South Capitol street, about fifty feet from the building line of South Capitol street. Said witness further testified that he saw where Landrigan was picked up after he was hurt; he was

a little west of the southwest crossing, in front of the tool-
house; he saw blood around there and a little proud flesh
right alongside the south track, which is called the ladder
track; this blood and flesh was on the south side of the
ladder track; he saw it on the morning of the accident about
half-past four o'clock.   Landrigan died at the Emergency
Hospital a little after four o'clock on the morning of the
accident.

"[And thereupon counsel for the defendant admitted
that the plaintiff's intestate died from the injuries received
at the time in question.]

"And thereupon said witness further testified that train
No. 78 for New York was scheduled to leave the depot at
11:50 or 11:55.

"That the place he noticed this blood, etc., was at the
southwest crossing, a little west of the crossing; that the
distance from the gates to the southernmost rail of the lad-
der track at that point is about 15 feet; that the portion of
the ladder track lying west of the southeast crossing is used
for storing gravel cars and unloading coal; when they un-
loaded it they shoved it down there alongside of the prop-
erty yard of the railroad company and put it right over the
fence; it was never used for shifting or for making up or
breaking up trains or for storing passenger cars; the por-
tion of this track east of the tower was used for shifting
cars; this portion west of the tower was hardly used at all —
just for storing a couple of cars down there; this tower and
the yardmaster's office indicated on the map are the same;
in August, 1898, when Landrigan was killed, witness was
employed at the Pennsylvania Railroad round-house, and
had been so employed for about six and one-half years, and
was familiar with the use of those tracks; on the night
Landrigan was killed there were two cars, one containing
gravel, west of the southwest crossing; with these two cars
standing there on the west end of the ladder track a person
could not see anything coming from the west if he were
standing immediately outside of the south gate; the only
way he could see would be by walking out on the track and

looking up and down; that standing outside of the gate the flagman's box at the southwest corner of the southeast crossing and the tower beyond would obstruct the view of the ladder track looking east. Said witness further testified that in August, 1898, he was working in the daytime; that he had worked on the night force, but not during the year 1898; that he had occasion to cross the southwest crossing, at night, immediately prior to and about the time of Landrigan's death; that the gates as a general thing, in the nighttime, were down; that during the summer of 1898, and for five or six years previously, he had passed over this crossing three or four times a week at all hours of the night up to 1 o'clock, and that after 11 o'clock he generally found the gates down whether trains were passing or approaching or not; after 11 o'clock the gates were generally kept down whether there was a train in sight or not. Said witness further testified that there was an electric light on the north side of the southeast crossing about 200 feet from where Landrigan was killed; he had never noticed whether this electric light furnished any light of any consequence at the intersection of South Capitol street S. W.; that if a train were standing on the north track a few feet from the southwest crossing it would have the effect of making it darker at the.gates at the southwest crossing. And thereupon said witness further testified that the ladder track west of the southeast crossing is always rusty, and the track that is used for shifting purposes is always bright.

" And thereupon said witness, over the objection of counsel for the defendant, was permitted to testify that he and Landrigan used to go home together for two or three months; that they both worked at night at the time; that the gates were down and that they had to crawl underneath the gates to get home; that the gates were generally kept down and they very seldom ever saw the gates up; that the times when Landrigan and the witness crossed were between 12 and 1 o'clock at night and between 6 and 7 o'clock in the morning.

" And thereupon said witness, on cross-examination, tes-
tified that he had been in the employ of the railroad com-
pany for between six and seven years prior to March, 1900,
excepting a period of about three months, about three years
before Landrigan's death; that he ' notices ' the rust upon
the south track pretty nearly every time he passes there;
that he noticed it ' this morning;' there are four rails there
that are bright, two are rusty, and two others are not so
rusty; he has noticed this condition ever since he has been
crossing there for the last twenty years; this rust was west
of the southwest crossing; he did not remember testifying
at the former trial about there being rust on the tracks, be-
cause he was not asked the question; counsel asked him
about the rust ' this morning ' for the first time; the south
track is pretty well rusted — is rusty all the time; he knows
two tracks are bright, and the track fartherest north is not
as bright as the middle tracks; that he did not know whether
or not the center tracks have steel rails and the north and
south tracks iron rails, but did know there was a difference
in their weight, the rails of the middle or main tracks being
heavier; these tracks are more constantly run over and this
tends to keep them bright.    Said witness further testified
that his mother lived north of the tracks, and that he visited
her sometimes two or three times a week after he moved
south of the tracks; when Landrigan was hurt witness was
on the day shift; the time he worked on the night shift was
for three or four months in the early stages of his employ-
ment by the company, and afterwards for three or four
months when he returned to the service of the company and
two and one-half or three years before Landrigan's death;
that when he crossed the tracks with Landrigan at night
they were coming home to lunch between 12 and 1 o'clock.
This was about three years prior to Landrigan's death; wit-
ness did not cross with him while witness was working in
the daytime.    Said witness further testified that the western
end of the south track was used for storing cars and taking
cars in and out for the purposes of the property yard; that
he has seen these cars lie there two or three weeks after

they were unloaded; that they might have taken the cars out immediately after pushing them in, but he did not see them taken out; the two cars that were on this track when Landrigan was killed had been there for two or three days; that he did not know whether or not these cars had been pulled out and put back during these two or three days, but he noticed the number of one of the cars, and the other car looked like the same car. Said witness further testified that he calls ' shifting ' moving cars from one track to another, and that what they call a shifting track is generally used every day for shifting; that he has hundreds of times seen cars on that south track and knows they were put in and pulled out, but would not call the process of putting them in and pulling them out ' shifting;' that when he testified at the former trial that the shifting is very general down there, he meant that they shifted cars down there to load and unload in the property yard; that this track has only an outlet to the east, but in this respect it is similar to every other track in the yard; the only way it differs from them is that it is about eight or ten hundred feet from any switch along there; on the east this track communicates with every other track in the yard by a switch, and with the exception of the two main tracks, every other track in the yard has a blind end to it. Said witness further testified that during the year prior to Landrigan's death he crossed at this point, at night, after 11 o'clock, on an average of about once a week, or a little oftener; that he usually found the gates down whether trains were in sight or not; he has come there after 12 o'clock at night, when no trains were in sight, and found the gates up, but very seldom; he has found them up only when somebody halloaed to the man to raise them up; that after the traffic of the day was over they would put the gates down and keep them down unless somebody asked to have them raised; this crossing at night is not used as much as in the daytime; most of the shifting and switching is done up towards the eastern section of South Capitol street; that every train that comes from the Ninth street freight station

or Sixth street depot, going north, and every freight and passenger train coming from the north would have to cross the South Capitol street crossing; that the shifting engines. also cross there very frequently in the night-time; that engines from the round-house would come out on the ladder track, and then be shifted on the track upon which they were to operate, and all detached engines coming to or going from the round-house · pass over the South Capitol street crossing; that between 12 and 4 or 5 o'clock it is not very busy down there at this crossing. And thereupon said witness. admitted having testified at the former trial that he 'went around to see his mother once or twice a week, and when he passed going to work sometimes, the gates were up and sometimes down and there was no train in sight;' that he always found the gateman there when he was passing at night; when he got there at night and found the gates down he could not see whether there was a train in sight until he got out on the track and looked up and down; that he has found the gates down at night and walked out on the track and found a train or engines approaching or passing; that the watch-box south of the ladder track interfered with the view down that track to the east — the closer you get, the greater the obstruction from this box and the further away the more view you had of that track; that he thought, standing inside of the gates, the watch-box located outside of the gates and next to the fence south of the track would prevent a person seeing anything up that track; that you would have to get on the track before you could see up there on account of this watch-box, the fence, and the telegraph pole which were there; that west of the southwest crossing, towards F street, there is a curve; that you could not see around that curve until you got on the north side of the crossing; that although you could not see a train coming from that direction until you crossed the tracks you could hear it unless there were two or three trains passing at the same time, or an engine blowing off steam — then you could not hear anything; that he has crossed over at night and

found the gates up and when no trains were coming, but people were passing under, halloaing to the watchman to raise the gates; that the gates were never hoisted all the way — they were on a slant.

" And thereupon said witness, on redirect examination, testified that there was no shifting and making up or breaking up of trains on the southwest crossing, on the south track; that this was done east of that crossing, and the only trains that crossed there, freight or passenger, were trains that were already made up; that once in a while a passenger engine comes down from the Jersey yard on the north side of the crossing and switches off onto another track to get a car or something like that. Said witness further testified that they would hoist the gates at night high enough for a man driving a buggy to go under them, and then lower them again; that this south track from the southeast crossing to its western extremity was rusty — you could see it was seldom used."

Plaintiff offered five other witnesses, who resided in the neighborhood and were familiar with the crossing. Their testimony tended to prove that the gates were generally down at night after 10 or 11 o'clock until near daylight, whether trains were passing or not, and that passers in vehicles would frequently have to call up the gatekeepers to raise the gates. Passers on foot would do the same or pass under the gates, which were bars merely that could be lowered and made to touch ends several feet above the ground.

Other evidence tended to show that a Pullman car, running about the speed of the car which is supposed to have struck the deceased, would make " practically no noise at all," and that the vestibule light therein is so located as to illuminate the platform only, which is its purpose. The light is not intended to illuminate the track and will not cast its reflection more than two feet beyond the bumper of the car, but one standing some distance away would see the reflected light on the platform.

No witnesses were introduced on behalf of the defendants.

*Mr. Frederick D. McKenney* and *Mr. J. S. Flannery* for the appellants (*Mr. Wayne Mac Veagh* being with them on the brief):

1. The important question to be determined in order to reach a decision in this case is what was the direct and proximate cause of the injury to the plaintiff's intestate? Was it caused by the servants of the defendants in failing to securely couple the runaway car, assuming that it was not safely coupled, or were Landrigan's injuries the result of his own voluntary exposure of himself to peril in going under the closed gates and standing upon or near the ladder track or any of the other tracks at said crossing? Whatever negligence there may have been on the part of the employees of the company in the particulars claimed by the plaintiff — in failing to have the brakes upon the car in good working order, or in not securely coupling it, or providing a light on the advancing end — occurred prior to Landrigan's exposure of himself to danger. Landrigan stated to the men who went to his assistance immediately after the accident happened that he came under the gates, something struck him, and a whole string of cars ran over him, showing that there was no appreciable interval between the act of going under the gates and the time when he was struck by the car. Train No. 78 reached the crossing at about 11 : 55 P. M. Landrigan, who was a railroad man and undoubtedly familiar with the defendant's schedule of its regular trains, who had crossed at this very place at this hour of the night for a number of years, reached the crossing about the time No. 78 was approaching, went under the gates, and was struck either by it or by the runaway car. His exposure to danger, therefore, and the injury were almost simultaneous. His own act was the direct, immediate, and proximate cause of his injury. The act of the crew of the yard engine in not securely coupling the car was at most but the indirect and remote cause. The distinction between remote and proximate causes is clearly defined. Whenever two causes unite to produce a given result, one of which is responsible and controlling and

the other merely incidental to and set in motion by the other, the controlling cause is regarded as the proximate cause, although it may not be the nearer in point of time. But where the two causes are separate and independent, then that cause which is the nearest in point of time to the exposure is regarded as the proximate and direct cause, and the other as secondary and remote. *Insurance Co.* v. *Boon,* 95 U. S. 130, 131; *Scheffer* v. *Railroad Co.,* 105 U. S. 249; *W. & G. RR. Co.* v. *Hickey,* 166 U. S. 528. See also *Cullen* v. *Railroad Co.,* 8 App. D. C. 69, which possesses many points of similarity to the case at bar.

2. The evidence does not disclose an invariable and uniform custom to keep the gates at this crossing down after ordinary bedtime at night, such as would have justified the plaintiff's intestate in relying upon it. A custom must be uniform, certain, and established. It cannot be changeable, variable, or unsettled. 27 Encyc. of Law, 719, 720; *Glover* v. *Scotten,* 82 Mich. 369; *Hickey* v. *Railroad Co.,* 14 Allen, 429 (Mass.); *Humphreys* v. *Newport News Co.,* 33 W. Va. 135; *Bryant* v. *Cent. Vt. RR. Co.,* 56 Vt. 710.

3. The decisions of the courts are unanimous in holding that it is negligence in law to go under closed safety-gates at a railroad crossing. *Granger* v. *Boston & Albany RR. Co.* (Morton, C. J.), 146 Mass. 276; *Allerton* v. *Railroad Co.,* 146 Mass. 241; *Debbins* v. *Railroad Co.,* 154 Mass. 402; *Marden* v. *Boston & Albany RR. Co.,* 159 Mass. 393; *Peck* v. *Railroad Co.,* 50 Conn. 379; *B. & O.* v. *Colvin,* 118 Pa. St. 230; *Cleary* v. *Railroad Co.,* 140 Pa. St. 19; *Sheehan* v. *Railroad Co.,* 166 Pa. St. 354; *Duvall* v. *Mich. Cent. RR. Co.,* 105 Mich. 386; *Douglass* v. *Railroad Co.,* 100 Wis. 405; 76 N. W. Rep. 356 (1898). See also *Lake Shore & Michigan RR. Co.* v. *Ehlert,* 19 A. & E. R. R. Cases (N. S.) 731 (Ohio S. C.); *Buckley* v. *Railroad Co.,* 15 A. & E. R. R. Cases (N. S.), 1 and note (Mich. S. C.).

4. The evidence bearing upon the use of the " ladder " track conclusively shows that this track was used almost constantly, and the irregular character of its use made it more dangerous than any of the other tracks at the crossing. The

Supreme Court of the United States has held time and again that a railroad track is always to be regarded as a place of danger, and that the track itself is a warning of danger. That court has also held that " it can never be assumed that cars are not approaching on a track or that there is no danger therefrom." *Elliott* v. *Chicago, etc., RR. Co.,* 150 U. S. 245, 248.

5. The evidence having failed to show that the plaintiff's intestate looked and listened before attempting to go upon the ladder track, the court told the jury that the presumption of law would be that he did stop, look, and listen. We think this was manifestly erroneous. Landrigan was bound to look and listen, and the fact that he was injured by this car, although he could have seen it if he had used his senses, proves that he did not look. *Northern Pacific RR. Co.* v. *Freeman,* 174 U. S. 384; *Hook* v. *Mo. Pac. Ry. Co.,* 63 S. W. Rep. 360; 21 A. & E. R. R. Cases (N. S.), 787. The true rule in cases of this character is that there is no presumption of law against or in favor of either plaintiff or defendant; there is no presumption of negligence, nor is there any presumption of the exercise of due care, on the part of either party. In this jurisdiction the burden of proving the negligence of the defendant is upon the plaintiff; the burden of establishing the contributory negligence of the plaintiff rests with the defendant unless it appears from the evidence given by the plaintiff (15 Wall. 401). See also 7 Am. & Eng. Encyc. of Law, pp. 439, 440; 12 A. & E. R. R. Cases (N. S.), notes at pp. 416, 417. In the case at bar, where the only evidence — the nature of the accident, the physical surroundings at the place where it happened, and the deceased's own statement of how it occurred — showed that he did not look for the approaching car, whatever slight presumption there may have been in his favor that he exercised due care was overborne, and it was grave error in the trial justice to instruct the jury as he did in giving the substituted prayer set forth above. Beach on Contributory Negligence, Sec. 182; *Mo. Pac. RR. Co.* v. *Foreman,* 73 Tex. 311.

6. In many jurisdictions, like Maryland, where it is held that, in the absence of all evidence, it will be presumed that the decedent exercised reasonable care, it is said to be error to give an instruction like that here complained of, where there is any evidence from which it might be inferred that such care had not in fact been exercised. *Philadelphia, Wilmington & Baltimore RR. Co.* v. *Stebbing,* 62 Md. 504.

*Mr. J. J. Darlington, Mr. Charles A. Douglass,* and *Mr. Joseph D. Wright* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. Upon the evidence which has been recited, the court submitted the case to the jury, giving certain instructions asked by the plaintiff and denying all those asked on behalf of the defendants.

Exceptions were duly reserved to the granting and denial of these instructions, respectively, but it is not considered necessary to repeat them as they only present with elaboration the substantial propositions, founded on the insufficiency of the evidence, upon which the appellant relies.

2. Whether the deceased was run over by the Pullman car that broke loose and ran down the first or "ladder" track, or by the express train which passed on the adjoining track, near about the same time, was unquestionably for the ascertainment of the jury.

There was no direct evidence showing upon which of these two tracks the accident occurred, but many circumstances established by the evidence indicated that the deceased was struck by the Pullman car whilst on 'or near the "ladder" track. And it cannot be assumed that these were completely refuted by the declaration of the stricken and suffering man, that he had been run over by " a whole string of cars."

3. Whether, if the deceased was run over by the Pullman car whilst on or near the ladder track, it was negligence on the part of the defendants' employees to permit that car to

escape and run down the track past the street crossing, was also properly submitted to the jury.

The testimony relating to the manner in which the Pullman car had been coupled to the next car ahead of it, as well as to the failure of the attempted operation of the brakes, came entirely from the employees upon whom the charge of negligence rests. It has been recited in the statement of the facts of the case, heretofore given, as it appears in the bill of exceptions, and is so direct and plain, that its review would not make the question plainer. In our opinion, the least that can be said of this evidence is, that reasonable men may fairly differ as to whether or not it disclosed negligence.

" It is only where the facts are such that reasonable men *must draw the same conclusion from them,* that the question of negligence is ever considered as one of law for the court." *T. & P. RR. Co.* v. *Gentry,* 163 U. S. 353, 366; *Cowen* v. *Merriman,* 17 App. D. C. 186, 202. See, also, *Adams* v. *W. & G. RR. Co.,* 9 App. D. C. 26, 31, and cases cited.

4. The chief reliance of the appellants is upon the contention, that the court erred in refusing to direct the jury to find for the defendants on the ground that the evidence showed, as matter of law, a plain case of contributory negligence on the part of plaintiff's intestate.

(1) The exceptional conditions which make it the duty of the court to take from the jury the determination of the question, whether, in a particular case, negligence has been shown to exist, have been stated hereinabove with a citation of the supporting authorities. After a careful examination of the testimony, we are not satisfied that those conditions exist in the case at bar. What was said in one of the cases before cited is quite applicable to the facts now under consideration : " In this case it may well be contended that the proof of contributory negligence on the part of the deceased is strong, and many reasonable minds might be decidedly inclined to conclude from it that the deceased was guilty of contributory negligence in causing the accident. But the state of proof is such that we cannot say that *all reasonable men* would so conclude. The court below thought that the evidence was

not conclusive, and the jury concluded that the evidence was not sufficient to establish the fact that the deceased, by his own fault and want of caution, contributed to the production of the disaster." *Cowen* v. *Merriman,* 17 App. D. C. 202, 203.

(2) In submitting the case in all its bearings to the jury, the court correctly charged them that what is proper care and caution cannot be arbitrarily defined, but must depend upon the special circumstances and surroundings of the particular case. What may be ordinary care under one set of circumstances might be gross negligence under different surrounding conditions. *Grand Trunk Ry. Co.* v. *Ives,* 144 U. S. 408, 417.

(3) As no witness saw the deceased immediately before he passed under the arm of the gate, or between that time and the receipt of the injury, and his only statement was that he had been run over by a whole string of cars, the jury had the right to presume that he had both looked and listened for approaching cars before stepping on, or dangerously near, the track, whichever he may have done.

The court did not err in so charging them with respect to this presumption, saying, at the same time, that it might be rebutted by facts and circumstances from which the contrary could reasonably be inferred. *T. & P. Ry. Co.* v. *Gentry,* 163 U. S. 353, 367; *Cowen* v. *Merriman,* 17 App. D. C. 186, 204.

The facts and circumstances relied on by the appellants to show that the deceased did not stop, look and listen, are these, briefly stated: He saw and passed under the warning gate, and walked upon or across a track that was in common and frequent use for shifting cars. The car which struck him, came with no great speed down the track with a light in the dome of the vestibule. Hence it is argued that he would necessarily have seen and heard it had he stopped, looked and listened as a man of ordinary care should have done.

The fact that the deceased did not stop and remain at the gate has direct bearing on the general question of his contributory negligence and will be recurred to at a later stage.

It seems to have no important bearing on the particular fact whether deceased stopped, looked and listened for the approaching car or cars before reaching the adjacent track. It was not immediately at the track and the evidence tended to show that approaching cars could not be seen from it for any distance. Moreover, deceased was familiar with the crossing and the gate gave him no notice of anything that he did not already know in respect of the number, proximity and use of the tracks.

On the other hand the evidence tended to show, that freight cars were occasionally stored on the ladder track east of the street crossing; that it was not regularly used at that point for making up trains; that passenger coaches were not run down that far; that a Pullman car running down the track in the manner described would make little or no noise; that the light in the vestibule dome was not a head-light, and that its reflection was cast upon the platform and not more than two feet beyond the car bumpers; the night was a dark one, and the electric lights not very near; moreover, the express train which must have passed about the same time added to the noises, and its smoke and that of an engine of a freight train which stood on the third track and nearly opposite the crossing, tended to increase the obscurity. Whether, from all these circumstances it was to be inferred that the deceased did not stop, look or listen, but walked recklessly to his death, was a question for the jury.

(4) Without pausing to review the authorities cited on behalf of the appellants, it may be conceded that, where a gate is maintained at a crossing, and regularly lowered when trains are expected, and kept lowered until they shall have passed, and is then uniformly raised and kept raised when none are due or expected, it is a warning of danger to the public and sufficient, under all ordinary conditions, to justify the conclusion of contributory negligence, as a matter of law, on the part of one who undertakes to cross the tracks while the gate is down, and is run over by a passing train in so doing. See, also, *Railroad Co.* v. *Carrington,* 3 App. D. C. 101, 111, and cases cited.

But that is not the case presented by the evidence. The gate had not been uniformly lowered and raised for the purpose of warning on the one hand, or of assurance on the other. The evidence tended to show that the gates were often lowered from 10 to 11 o'clock at night, and kept lowered until daylight the next morning, without regard to the passing of trains.

Passengers desiring to cross in vehicles were frequently compelled to call up a gateman to raise the gate. Persons on foot would do the same or else pass under the gate and then across the tracks.

This state of things had existed for some years during which the deceased was almost nightly engaged in crossing the track at that point in going to and fro between the machine shop and his home.

Under this evidence, we do not agree with the contention that all reasonable minds must necessarily come to the one conclusion that deceased was guilty of contributory negligence in passing under the gate and attempting to cross the tracks, without any other act of negligence. Finding the gate closed under these circumstances, the deceased was not bound in law to take it as a warning of immediate danger, and to stop and wait and call for information to an unseen gateman. If in fact there was a gateman within sight or hearing at the time, there is nothing in the evidence from which it could be inferred. That the evidence does not show that the gate was invariably kept down each night between 11 o'clock and daylight, we regard as immaterial so far as the question of law is concerned. The constancy or variableness of the practice was a question merely, of more or less weight, according to the facts and circumstances, for the consideration of the jury. And the court did not err in submitting the whole question to them, as was done, under a full, fair and appropriate charge.

The judgment will be affirmed, with costs; and it is so ordered.    *Affirmed.*